UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank NOVELLO, Defendant-Appellant.

No. 75–1375
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Sept. 19, 1975.

Theodore Sakowitz, Federal Public Defender, Miami, Fla. (Court appointed, not under Act), for defendant-appellant.

Robert W. Rust, U. S. Atty., Rebekah J. Poston, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

The sole issue in this case is whether a warrantless intrusion into a warehouse by Drug Enforcement Agency (DEA) people violated the Fourth Amendment ban on unreasonable searches. Novello contends that, because it did, incriminating evidence which resulted in his conviction should be suppressed and a new trial ordered. We affirm.

---

\* Rule 18, 5 Cir., see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

The situation presented is that of a container within a container—half a ton of marijuana inside a closed truck inside a locked warehouse. It is with the invasion of the warehouse that we are solely concerned. For the truck was entered by authority of a warrant, and the warrant is attacked solely on the basis that matter from the warehouse incursion formed the basis for its issuance. We therefore turn to how the agents came to enter the warehouse.

In early 1974, Novello approached one Kramer about renting space in a mini-warehouse located in Hallandale, a city situated in Florida's east-coast metropolitan belt and lying somewhat north of Miami toward Ft. Lauderdale. Novello told Kramer, the rental agent for the building, that he had a large truck outside loaded with furniture and required a secure place to store it indicating, in Kramer's view, more interest in safety for his goods than in privacy. An agreement was struck, and Novello rented a bay in the warehouse which was completed but which, because it had not yet been inspected, could not be occupied immediately. In view of this, arrangements were made for Novello to use another area temporarily. This comprised projected Bays J, K, L and M, which formed one large area because internal partitions had not yet been erected. Novello was told that only Kramer and persons working with him, those doing work in these bays or storing matter in them, would have access to the temporary storage area.

About ten days later Jones, one of those persons designated by Kramer as having access, entered the temporarily-rented area by means of his own key in the early morning hours, but after daybreak, probably around eight o'clock. At about 8:45 that morning, DEA received a call from this entrant, who identified himself and related what he had seen in the area occupied by Novello. This was a 1½ ton rental truck illuminated by the headlights of two other automobiles locked with it in the bay—though opening an access door would have admitted the light of day. Jones also related that he had seen a large bale or package in the trunk of one of the cars and smelled an odor like marijuana. The men in the bay had seemed, he thought, very nervous. The DEA sent four agents who interviewed Jones about his observations.

These agents concluded that, before taking action, they should verify Jones' observations. By this time it was near noon. They went directly to the warehouse about a mile away and approached one McCartney, who ran a woodworking shop in yet another bay and whom Jones had told them possessed keys to all bays for the purpose of admitting building inspectors when Kramer was absent. One agent told McCartney that Jones had sent him to look at some scaffolding. McCartney knew Jones had scaffolding stored in the unpartitioned area of the warehouse which Novello was using. He therefore admitted the agent, though refusing to give him the key. When the other officers came in, McCartney realized he had been duped but was powerless to amend matters in the face of such numbers. The agents identified themselves as DEA, took the license number of the truck, picked up some specks of marijuana residue lying in open view on the floor, and left to obtain a search warrant. They asked McCartney to tell no one of their visit and posted two agents to watch the area. About 3:00 p. m., a search warrant was issued on the basis of Jones' information, supplemented by what the agents themselves discovered on their foray into the warehouse. By means of it the agents searched the rental truck and seized 1,224 pounds of marijuana which subsequently furnished evidence at Novello's trial. Novello himself was arrested and charged when he later appeared on the scene.

▮ We conclude that Novello had no reasonable expectation of privacy in the area set aside for his temporary use. He took his chance that other persons unconnected with him and having good right to enter the premises for their own

purposes might do so at awkward times—as did Jones. More, if more be needed, that they might, as did McCartney, and duped or no, grant permission for law enforcement officials to come upon and ransack an area as fully under control of those who admitted them as under his.

The law in such cases is well set out in *United States v. Piet,* 498 F.2d 178, 181 (7th Cir.), *cert. denied, Markham v. United States,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974), where the court said:

> Respecting the first point, Markham asserts that Frank Smith lacked the authority to permit FBI agents to inspect a storage room at the warehouse in which Markham's goods were commingled with those of others who leased space at the facility. In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242, 42 U.S.L.W. 4252 (1974), the Supreme Court reiterated that permission to search may be obtained from a third party who possessed either common authority over or other sufficient relationship to the premises or effects. *"The authority which justifies third-party consent does not rest upon the law of property . . . [but rather] on mutual use of the property by persons generally having joint access or control for most purposes." Id.* at 4254 n. 7, 94 S.Ct. 993. Frank Smith introduced himself as the warehouse foreman and stated that he was in charge in the owner's absence. Smith also told the FBI agents that he had one of two keys to the common storage area where Markham's goods were kept and that Markham did not have a key to the facility. Smith freely consented to the FBI search, and he led the agents to the area where Markham's goods were stored. From the labels on the Black and Decker cartons, the agents ascertained that the boxes contained the stolen lawn edgers. The agents then left the warehouse. *Whatever Smith's position, it is clear that Markham was aware, as a practical matter, that Smith and the warehouse owner—who possessed the only keys to the common storage room—had access and control over the common area.* We find, therefore, that Markham had no reasonable expectation of privacy respecting the storage of his goods, *see, United States v. Eldridge,* 302 F.2d 463 (4th Cir. 1962), and assumed the risk that the persons in charge of the facility might willingly and voluntarily grant permission for agents to enter and search the common storage area. *See, United States v. Matlock, supra; Von Eichelberger v. United States,* 252 F.2d 184 (9th Cir. 1958). (emphasis added.)

Two factors distinguish *Piet* from our case, but neither differentiates its rule. In *Piet,* the defendant whose stolen booty was found had no direct access to the warehouse where it was hidden. Control of access was in the third party who consented to the search by law enforcement agents. But *Matlock,* upon which *Piet* relies, is higher authority still, and it observes that *joint* access or control and mutual use of the area by third parties gives rise to authority in them to consent to such a search as this. Indeed the proposition is self-evident and should have been plain to Novello. One who knows that others have of right general and untrammeled access to an area, a right as extensive as his own, can scarcely have much expectation of secrecy in it or confidence about whom they may let inspect it.

 Further, in *Piet,* the third-party consent given to inspect was both informed and voluntary, not the product of a ruse. But this has no bearing on the reasonableness of Novello's expectations of privacy. Knowing that a right to authorize entry reposed in others, he had as much to fear from ruses, indeed from bribery or coercion, as from informed consent. The mode by which consent was obtained cannot be seen to figure in his privacy calculus, once he knew a general control over entry reposed in others unknown to him, both in number and

identity, whose right of access was general, not limited, and was in no sense derivative from his. Upon the loyalty or discretion of such unknown strangers he could have no reasonable claim. That they would have such access was made known to him before he committed his contraband to the common area. They were the functional equivalent of the public, and "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).

We decide the case before us. Since it is plain that Novello had no reasonable expectation of privacy in the common area concerned, the consent analysis which would otherwise have been necessary[1] need not be undertaken and we express, of course, no view upon it.

Affirmed.

---

1. Had, for example, Novello mistakenly believed he had sole access, so that his expectations of privacy were reasonable, and entry been properly authorized by a third party.