UNITED STATES of America, Plaintiff-Appellee,

v.

Kenneth P. PITT, Jr., Paul E. Kane, Defendants-Appellants.

No. 82-5078.

United States Court of Appeals, Eleventh Circuit.

Oct. 21, 1983.

Rehearing and Rehearing En Banc Denied Nov. 18, 1983.

B. Anderson Mitcham, Tampa, Fla., for Pitt.

Rodney Morgan, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and COLEMAN,* Senior Circuit Judge.

COLEMAN, Senior Circuit Judge:

This case arises from a misbegotten effort to palm off forged foreign corporate

---

* Honorable James P. Coleman, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-  tion.

stock certificates as security for a five million dollar loan, sought of a broker in Munich, Germany. When the bogus securities were tendered the forgery was immediately detected and the attempted fraud blew up. Kane and Pitt were indicted for (1) wire fraud, committed in the course of efforts to arrange for the negotiation of the forged instruments, and (2) for the possession and delivery of false, forged, or counterfeit stock certificates of a foreign corporation with intent to defraud, 18 U.S.C., §§ 1343, 480, and 2. The defendants were duly convicted and sentenced. They have had the benefit of oral argument on appeal and we now affirm their convictions.

In general, the proof was convincingly overwhelming that the spurious documents had been forged in Tampa, Florida, had been transported to Munich, and had been tendered as genuine. The defendants played different parts at various times and places in the production of the forgeries and in the efforts to convert them into millions at the expense of the intended victim. A lengthy factual description of the manifold maneuvers involved in the failed fraud is unnecessary. The appellate points raised by Kane and Pitt will be discussed hereinafter.

I

*Kane*

In an effort to overturn his conviction Kane argues only that incriminating rubber stamps and telephone bills introduced in evidence by the government should have been excluded as obtained in a search which violated his Fourth Amendment rights.

Tampa police officers arrested Kane in a bedroom at the apartment of his girlfriend on a check charge unrelated to the present case. During the course of the arrest, and because of information supplied by the girlfriend, the officers took Kane's keys and unlocked the door to a partitioned off room at the rear of a detached garage adjacent to the apartment. This resulted in the discovery of the rubber stamps and the telephone bills, which were found either lying out in the open or in a cigar box on the top of a desk. The items were not in a strongbox or otherwise concealed or under lock and key.

After a hearing on a motion to suppress, the trial court found that the girlfriend, *not Kane,* was the renter or lessee of the premises where the arrest was made. The friend denied having any access to the room in the garage, saying that Kane was using it through some kind of an arrangement with the landlady, to which she had not been a party.

Kane testified that he had put a padlock on the door to the room and that he had given a key to the landlady in order that she might have equal right and access to her own belongings which were in the room along with some goods belonging to other apartment holders.

The court declined to credit the assertion of the police officers that the search had been accomplished with Kane's consent but did credit the testimony of the landlady that by the rental agreement with the girlfriend that individual was not to have possession of or access to the room in question, that she intended to reserve the room for her own exclusive use. Only after repeated instances of unconsented forcible entry had the landlady "backed off" and quit contesting the partial or shared use of the room by the female renter. Indeed, the landlady testified that she had no recollection of ever receiving a key from Kane. She did know that Kane was at the apartment on occasion and once he had given her a check for the rent. The day after the arrest Kane had informed the FBI that he resided at another address in Tampa.

The court denied the motion to suppress, relying on *United States v. Novello,* 519 F.2d 1078, 1080 (5 Cir.1975).

Judge Hodges summarized his conclusion this way:

We then come to the defendant's own testimony that he purchased the lock and put it on this building, but gave a key to Mrs. Moore so that she might have an equal right of access to her own belongings, some of which remained in that

area. And she was, insofar as the defendant is concerned, a stranger to him, both contractually as well as personally, it would seem to me, which tends to distinguish his situation from the circumstances in *Haydel* [*United States v. Haydel,* 649 F.2d 1152 (5th Cir.1981)], which involved the maintenance of a son's room in his parents' home, or, indeed, from *Novello* [*United States v. Novello,* 519 F.2d 1078 (5th Cir.1975)], itself, for that matter, which involved a direct contractual relationship between Novello and a public warehouseman which, on the facts of *Novello,* retained an equivalent right of access, which Judge Gee in his opinion of the Court found to be the determining factor which precluded a finding that the defendant had the requisite expectation of privacy to support a Fourth Amendment claim.

So on the facts as I have found them, and as I stated at the outset of these remarks, it seems to me that *Novello* is controlling, and while it's by no means an aged decision, having been rendered in 1975, it is comforting to note that it would seem to be perfectly consistent with more recent Supreme Court and Fifth Circuit decisions interpreting and applying the more recent Supreme Court authority.

So on that authority, I will, and do, now deny the motion to suppress the items which were taken by Detective Sims or Green or others of the Tampa Police force from the shed in question on May 6, 1977.

In *Novello* the Fifth Circuit had held that "one who knows that others have of right general and untrammeled access to an area, a right as extensive as his own, *can scarcely have much expectation of secrecy in it* . . . ." (Emphasis added). The *Novello* court further observed that where one knows in advance that others have access to a room or building, the other individuals are "the functional equivalent of the public", citing *Katz v. United States*[1] to the effect that what a person knowingly exposes to

the public, even in his own home or office, is not the subject of Fourth Amendment protection.

As already noted, the trial court also considered *United States v. Haydel,* 649 F.2d 1152 (5 Cir., 1981), in which a bookmaker kept his records in the home of his parents, where he often stayed himself, to which he had a key, and in which it was reasonable to assume that he had the authority to exclude persons other than his parents and their guests. Unlike Kane, Haydel had not given a key to someone else. On the totality of the circumstances, it was held that Haydel had a legitimate expectation of privacy in the area searched.

The *Haydel* court, expounding its analysis of *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), concluded:

No one circumstance is talismanic to the *Rakas* inquiry. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. *See Id.; Rawlings v. Kentucky* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The thing that decisively distinguishes Kane's case from that appearing in *Novello* and *Haydel* is that Kane was *an intruder,* trespasser if you will, who assumed to lock a door which he had no legal right to lock on the premises of another and without the

1. *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582.

owner's consent. We think *Rakas* clearly teaches that such activity is not entitled to Fourth Amendment protection.

*Rakas* clearly says, 439 U.S. at 134, 99 S.Ct. at 425, that "a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed".

■ In addition to that, we think this search met all of the standards mentioned in *Haydel:*

(1) Kane had no possessory rights to the use of the room to which he had applied the padlock. He was not legitimately using the room. He was an intruder, who, for awhile, was getting away with it;

(2) He knew that he had no right to exclude others from the room, else he would not have given the landlady a key to the door which he had presumed to lock up;

(3) He knew that others were, in fact, using the room;

(4) His use of a padlock, standing in isolation, might meet his burden of showing that he had a subjective reasonable, legitimate expectation of privacy, but that is negated by factors (1), (2), and (3) and further negated by the fact that he left the items out on the desk, where they could be seen or examined by anyone else using the room and having enough curiosity to take a look, and with no more security than a cigar box.

We hold that the search of this room did not infringe any Fourth Amendment privacy rights which Kane could legitimately have expected or asserted. The motion to suppress was correctly denied.

In this connection, see, also, *United States v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) [the issue is whether there was an invasion of any legitimate expectation of privacy]; *United States v. Porter,* 701 F.2d 1158 (6 Cir.,1983) [the permissive use of a hangar on which the defendant had placed a padlock carried no legitimate expectation of privacy where he had been given no control over the hangar and where he knew that his was not the only property stored there].

Kane's convictions are affirmed.

## II

### *Pitt*

Pitt contends that the trial court erred in failing to grant all the requests in Pitt's motion for disclosure of impeaching evidence. Particularly, Pitt asked for:

Any and all personnel files for the witness [FBI Agent Lewis], the existence and identity of all federal, state, and local government files for the witness and the existence and identity of all official internal affairs, internal investigation or public integrity investigation files relating to or connected with each witness who was or is a law enforcement officer.

The trial court granted Pitt's motion to the extent that they met the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), but the personnel files of government employees and law enforcement officers who served as witnesses for the prosecution were not turned over.

During the course of the trial, the government brought out the fact that Pitt had given false testimony to the grand jury regarding the Bahamian property Pitt "bought" from Kane. Pitt's counsel attempted to soften the impact of the grand jury perjury by offering evidence of misconduct by Special Agent Gerald Lewis of the FBI. More specifically, Pitt alleged that he had lied to the grand jury because Agent Lewis had threatened him on two occasions.

Agent Lewis was later called by the government as a rebuttal witness and testified that he had never threatened Pitt. Lewis also showed, from FBI records, that he was away from Tampa on the day Pitt claimed that he was threatened near the grand jury room.

Pitt argues that he could not effectively cross-examine Agent Lewis without reviewing Lewis' personnel file to determine if the file contained potentially impeaching material.

■ Due process mandates the disclosure of favorable evidence, *material* for exculpatory or impeachment purposes, to an accused upon request, *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196; *Giglio v. United States,* 405 U.S. at 154, 155, 92 S.Ct. at 766. The evidence in question must be material to impeachment or exculpation for the *Brady* edicts to apply. *United States v. Hildebrand,* 506 F.2d 406, 409 (5 Cir.), *cert. denied,* 421 U.S. 968, 95 S.Ct. 1961, 44 L.Ed.2d 457 (1975). *Cf., United States v. Medel,* 592 F.2d 1305, 1317 (5 Cir., 1979) [Fifth Circuit applies strict standard of materiality in evaluating *Brady* evidence]; *United States v. Crockett,* 534 F.2d 589, 601 (5 Cir., 1976). In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court, recognizing that in *Brady* there had been a specific request for disclosure of evidence, characterized the materiality requirement of *Brady* as being whether "the suppressed evidence might have affected the outcome of the trial", *Id.* at 104, 96 S.Ct. at 2398. The Fifth Circuit has provided further guidance on the standard of materiality in *Calley v. Callaway,* 519 F.2d 184 (5 Cir., 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). Judge Ainsworth, writing for the en banc Court, stated that:

> [W]hen *Brady* is invoked to obtain information not favorable on the issue of guilt or innocence but useful for attacking the credibility of a prosecution witness, the information withheld must have a definite impact on the credibility of an *important* prosecution witness in order for the nondisclosure to require reversal. (Emphasis added). 519 F.2d at 222.

*See, also, United States v. Gaston,* 608 F.2d 607, 613 (5 Cir., 1979) [impeachment evidence sought under *Brady* must have definite impact on important prosecution witness's credibility before failure to conduct *in camera* investigation warrants re-

versal]; *United States v. Judon,* 567 F.2d 1289, 1293 (5 Cir., 1978) [*Brady* challenge dismissed, quoting *Calley's* materiality standard for impeachment evidence].

■ We fail to see how, and the appellant has failed to show us how, the contents of FBI Agent Lewis' personnel file would likely contain anything *material* to an alleged threat against Pitt, especially when the official records show that the agent was out of town on the day the alleged threat was made.

The request for the agent's personnel file, under the facts of this case, was frivolous. Pitt was entitled to fish, but not with this thin a pole.

The second argument is that the evidence was insufficient to support Pitt's conviction. This argument, too, must be rejected.

■ The standard for reviewing the sufficiency of the evidence in a criminal appeal is whether, viewing the evidence and all reasonable inferences therefrom in a light most favorable to the government, substantial evidence exists to support the conviction. *United States v. Latner,* 702 F.2d 947, 948 (11 Cir., 1983); *United States v. Schwartz,* 666 F.2d 461, 463 (11 Cir., 1982); *United States v. Gray,* 659 F.2d 1296, 1302 (5 Cir., 1981). The test is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt". *United States v. Bell,* 678 F.2d 547, 549 (5 Cir., 1982) (Unit B en banc); *United States v. Vera,* 701 F.2d 1349, 1357 (11 Cir., 1983); *United States v. Morano,* 697 F.2d 923, 927 (11 Cir., 1983).

■ In establishing wire fraud under § 1343, the government must prove a scheme, use of interstate communications, and criminal intent to defraud. *United States v. Cowart,* 595 F.2d 1023, 1031, n. 10 (5 Cir., 1979); *United States v. Bradford,* 571 F.2d 1351, 1352 (5 Cir.), *cert. denied,* 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978). *See, also, United States v. Jackson,* 451 F.2d 281, 283 (5 Cir., 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972) [need only to show a scheme and that as a step in the execution thereof, interstate

wires were used]. However, the government does not have to prove that the defendant charged with the offense actually used the interstate facilities; it will suffice if the government proves that the defendant caused the use of the interstate wires, and that such use was the foreseeable result of his acts. *United States v. Jones,* 554 F.2d 251, 253 (5 Cir.,), *cert. denied,* 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977); *United States v. Snyder,* 505 F.2d 595, 601 (5 Cir., 1974), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975).

To prove a violation of § 480, the government must show the knowing possession or delivery of a counterfeit stock certificate of a foreign corporation and criminal intent to defraud. *Cf., Forlini v. United States,* 12 F.2d 631, 633, 634 (2 Cir., 1926) [analyzing earlier version of statute].

■ Pitt was shown to be a major stockholder and an officer of the Padima Corporation, the shell corporation, headed by Pitt, Kane, and Morgan, which was trying to borrow five million by using counterfeit Union Minier stock as collateral. Pitt actively participated in this venture. He signed a fraudulent financial statement to help Padima secure the loan, and he signed documents which would enable an individual to act on behalf of Padima Corporation while processing the loan in Europe. Pitt also signed the corporation resolution authorizing the loan. On behalf of Padima, he entered into a letter of intent regarding the disposition of the expected loan proceeds, from which he stood to receive personally a large sum of money.

The messenger chosen to deliver the forged stock certificates to Munich did not know that they were forged. When about to leave with the certificates he told Kane and Pitt that he did not understand why they were giving him fifteen million dollars worth of stock, that he could cash them in Europe and go to South America. Pitt told him not to worry about it—two guys would be watching him all the time.

An FBI fingerprint expert testified that Pitt's fingerprints appeared on both the order form to have the bogus stock printed and on the counterfeit certificates themselves. Additionally, the government produced the order form at trial, and Pitt's name and telephone number appeared thereon.

Although Pitt did not personally use the interstate wires himself, the wire communications that did occur were the clearly foreseeable results of a scheme in which he was an active participant, causing the wires to be used.

While Pitt did not personally deliver the stock, he aided and abetted in the delivery as an active and knowledgeable participant, up to his ears in the scheme. Under 18 U.S.C., § 2, Pitt must be considered a principal in the crime charged.

Viewing the evidence in the light most favorable to the government, we have no difficulty in holding that the government produced sufficient evidence to establish Pitt's guilt under §§ 1343 and 480.

### Conclusion

The convictions of both Kane and Pitt are AFFIRMED.