469, 474 (4th Cir.2004); *United States v. Diaz*, 245 F.3d 294, 303 (3d Cir.2001); *Kissick*, 69 F.3d at 1053 (finding an amendment substantive for this reason, even though labeled as "clarification"); *cf. Huff*, 370 F.3d at 465–66 (if the amended language comports with prior circuit law, then it is a clarification).[3] Since Amendment 660 unquestionably abrogates our *Gondek* decision, this factor also would weigh in favor of characterizing it as substantive.

■ Finally, we consider whether the amendment addresses an issue upon which the courts of appeals have already staked out opposing positions, this being some evidence that the amendment is not a mere clarification, *see Huff*, 370 F.3d at 465–66; *Davidson*, 283 F.3d at 684 (finding amendment substantive where the Commission expressly stated that it was "address[ing] a circuit conflict," and then "adopted a position"). This principle presumably is premised upon the notion that normally a circuit split would not result unless the original guideline language was ambiguous. Here, for instance, the Commission simply noted in Amendment 660, ¶ 2, that it would "follow" the Second, Third, and Tenth Circuits' view that consecutive sentencing is discretionary, but the Commission did not intimate that these three circuits correctly apprehended the Commission's original intent underlying the pre-amendment guideline, nor that conflicting interpretations like *Gondek* had misinterpreted that original intent. Rath-

er, the Commission asserted that it "follow[ed]" the holdings of the Second, Third, and Tenth Circuits.

As all of the above factors weigh in favor of characterizing Amendment 660, ¶ 2, as a substantive change, it cannot be applied retroactively to the Crudup sentencing.

*Affirmed.*

UNITED STATES of America,
Appellee,

v.

Cheryl BURNETTE, Defendant,
Appellant.

No. 02–1814.

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 2004.

Decided July 8, 2004.

---

Jane Elizabeth Lee, for appellant.

Donald A. Feith, with whom Thomas P. Colantuono, U.S. Attorney, and Peter E. Papps, Assistant U.S. Attorney, were on brief, for appellee.

Before LYNCH, Circuit Judge, STAHL, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

On September 15, 1999, a grand jury returned a two-count indictment against defendant Cheryl Burnette, charging her with wire fraud, 18 U.S.C. § 1343, and impersonating an employee of the United States, 18 U.S.C. § 912. Burnette was accused of convincing businesses to provide her with goods and services by falsely asserting that she was a government employee and that the government would pay the bills. Before trial, Burnette moved to suppress evidence obtained by law enforcement officials from her residence in Quechee, Vermont, as well as evidence obtained as a result of the warrantless search of the outside of her mail at three commercial mail receiving agencies. After an evidentiary hearing, the district court denied the motions. On October 5, 2001, following a four-day trial, a jury convicted Burnette of both counts in the indictment. Burnette challenges the suppression rulings on appeal. She also disputes the adequacy of the district court's jury instructions regarding reasonable doubt and, in a pro-se supplemental brief, raises a number of additional claims of error. After careful review, we affirm.

## I.

We draw the facts from the suppression hearing as found by the district court and supplemented by the record of the hearing. In a series of fraudulent schemes carried out between 1992 and 1996, Cheryl Burnette stole goods and services from numerous businesses and individuals by falsely representing that she was an employee of the EPA and that the goods and services she received would be paid for by the agency. In particular, she created a sham business entity, United States Environmental (USE), which she frequently misrepresented as her employer and a government agency. Burnette obtained fictitious procurement numbers in order to set up government accounts at a number of businesses and obtain goods without payment. She rented apartments by explaining that the EPA would cover the rent, and then abandoned them several months later. She enrolled in Harvard University's Summer School after falsely promising that the government would pay the tuition. Also under the guise of carrying out government business, Burnette obtained a Washington, D.C., telephone number for the USE, with an answering machine that identified the organization as a government agency, and purchased mail receiving and forwarding services from three commercial mail receiving agencies (CMRAs), two in Washington, D.C., and one in Boston, Massachusetts.

In late 1996, the United States Environmental Protection Agency (EPA) assigned Cassandra Todd, a Special Agent for the EPA's Office of the Inspector General (EPA–OIG), to investigate allegations that a woman using different variations on the

name Cheryl Appleton Burnette was pretending to be an employee of the EPA in order to obtain goods and services without paying for them. In the course of that investigation, Todd and other EPA agents inspected the outside of Burnette's incoming mail at the CMRAs from which Burnette was renting mail services. On two occasions, Todd applied for and received mail covers that allowed the United States Postal Service (USPS) to inspect the outside of Burnette's incoming mail prior to delivery.[1] On a third occasion, the USPS returned the mail cover application to the EPA for more information.

On September 23, 1999, EPA–OIG Special Agent Dennis Poltrino learned that United Parcel Service (UPS) had received a package addressed to Burnette that was scheduled to be delivered by a local taxi service. UPS delivered the package to the taxi service the next day, and Poltrino followed the taxi to Burnette's residence, located at 25 Alden Partridge Road, in Quechee, Vermont. The taxi left the package addressed to Burnette at the residence, and Poltrino learned from the neighbors that Burnette was living at that address.

On September 27, 1999, Poltrino and another EPA–OIG agent, Melissa Blaire, returned to the Vermont residence with a warrant for Burnette's arrest. When Burnette refused to open the door or leave the residence and subject herself to arrest, Blaire called the Hartford, Vermont Police Department for assistance, while Poltrino received instructions from the Assistant United States Attorney for the District of Vermont to forcibly enter the residence and arrest Burnette. Poltrino kicked in the door of the house and, with Blaire and two local police officers, stepped through the damaged door frame. Finding Burnette near the front of the house, Poltrino handcuffed her and placed her under arrest. He asked several times whether anyone else was in the house but Burnette refused to answer. Poltrino and one of the Hartford police officers noticed a man, later identified as Michael Tamulis, emerging from the bedroom. After handcuffing the man, Poltrino and Hartford Police Officer Allen Patterson performed a protective sweep of the residence and its basement to determine whether any other individuals were present in the house. During the sweep, Poltrino observed several items in plain view that he believed were connected to the crimes for which Burnette had been indicted, such as a fax machine, cell phone, laptop computer, and boxes from Harvard University.

After performing the protective sweep, Poltrino informed Burnette and Tamulis that they would be transported to the police station for questioning.[2] Poltrino testified at the suppression hearing that Burnette, who was still handcuffed, nodded toward an unopened black briefcase and a black leather bag that were on the floor

1. Under USPS regulations, a "mail cover" is a process by which the USPS makes a nonconsensual record of any information on the outside of a suspect's mail. Mail covers may only be sought by a law enforcement agency pursuant to a written request to the Chief Postal Inspector or his authorized agents specifying the reasonable grounds necessary for the cover. If a mail cover application is approved, the USPS will record the image of the exterior of the subject's mail and transmit reports to the requesting law enforcement agency for a period of 30 days. Postal regulations provide that "[u]nder no circumstances may a postmaster or postal employee furnish information as defined in § 233.3(c)(1) to any person, except as authorized by mail cover order." 39 C.F.R. § 233.3(g)(4).

2. Tamulis was subsequently charged in a complaint with Wire Fraud, but the government eventually dismissed the case against him.

about three feet away from her and asked to bring them with her to the police station. Burnette objected to this testimony. In her affidavit submitted in support of her motion to suppress, she alleged that she had asked Poltrino if she could bring a garment bag containing a change of clothes to the police station but that Poltrino had denied that request. At the station, the bags were inventoried, and the police retained two cards that identified Burnette as an employee of USE.

Poltrino remained at the residence after Burnette and Tamulis were taken to the police station in order to secure it until the front door could be repaired. While waiting, he conducted a second search of the residence, seeking to obtain more detailed information about some of the items he had noticed during his protective sweep, namely their brand names and serial numbers.

The next day, Poltrino applied for a search warrant to the United States District Court for the District of Vermont. Poltrino included in his warrant application information that he had obtained during his investigation from the initial protective sweep, the second search of Burnette's residence, and the inspection of Burnette's bags. The district court approved the warrant application, and Poltrino searched the residence a third time, seizing the items that he had listed in his warrant application.

Prior to trial, Burnette moved to suppress all evidence derived from the government's inspection of the outside of her mail at the CMRAs.[3] She did not argue that the government's review of the outside of her mail violated the Fourth Amendment. Rather, Burnette claimed that the government's conduct violated USPS regulations governing mail covers, which she argued applied to mail that had been delivered to a CMRA. She claimed that the remedy for such a regulatory violation was suppression. Burnette also filed a motion to suppress evidence collected during the searches of Burnette's Vermont residence, claiming that all three searches violated the Fourth Amendment's proscription against unreasonable searches and seizures. She further argued that the police illegally searched her briefcase and black bag at the police station after her arrest.

On October 10, 2001, the district court denied both motions.[4] It did not decide whether the EPA agents violated USPS regulations by inspecting the outside of Burnette's mail at the CMRAs. Instead, it held that because USPS mail cover regulations did not prescribe suppression as a permissible remedy, see 39 C.F.R. § 233.3, a violation of agency regulations would not, without more, justify the exclusion of otherwise relevant evidence. With respect to the searches of Burnette's Vermont residence, the district court held that the first search (the protective sweep) was reasonable. It agreed with Burnette that the second search was unlawful but concluded that the third search was saved by the doctrine of inevitable discovery. After conducting an evidentiary hearing on the issue, the district court found unpersuasive Burnette's assertion that the law enforcement officers brought her two bags to the police station over her objections. It credited Poltrino's testimony that Burnette asked to have both bags brought to the station and concluded that the inventory of those bags at the station was lawful.

---

3. Burnette did not challenge the admissibility of information that was obtained from the postal service pursuant to the mail covers.

4. In its memorandum and order, the court also denied three other pre-trial motions filed by Burnette, none of which are at issue here.

Burnette subsequently was tried before a jury on one count of wire fraud, 18 U.S.C. § 1343, and one count of impersonating an employee of the United States, 18 U.S.C. § 912. The jury returned guilty verdicts on both counts. On May 21, 2002, the district court sentenced Burnette to 24 months imprisonment on each count to be served concurrently and three years of supervised release, with the special condition that she pay $49,588.86 in restitution, a special assessment of $200.00, and other special conditions. Judgment was entered on June 17, 2002, and this appeal followed.

## II.

Ably represented by counsel, Burnette raises three issues on appeal. First, she argues that the district court erred in admitting evidence derived from the search of her mail at the CMRAs because those searches violated the Fourth Amendment's proscription against unreasonable searches and seizures. Second, she claims that the district court's finding of fact crediting Poltrino's testimony that Burnette asked him to bring two bags to the police station was clearly erroneous. Finally, she argues that the district court gave improper and misleading jury instructions on reasonable doubt. We address each of these issues in turn.[5]

## A. Search of the Outside of Burnette's Mail at the CMRAs

On appeal, Burnette does not challenge the district court's conclusion that suppression was not an available remedy for a violation of postal regulations governing the use of mail covers, nor does she argue

that such a violation in fact occurred. Instead, she claims that EPA agents conducted an unreasonable search in violation of the Fourth Amendment when they examined the outside of her mail that was contained inside a private mailbox situated in the private mailroom of a CMRA from which she rented postal services. Burnette claims, without explanation, that almost all of the evidence at trial derived from the search of her mail and, thus, that her conviction should be vacated and the case remanded for retrial.

Burnette acknowledges that she did not raise her Fourth Amendment claim below but argues that it was preserved for appeal because "the district court examined whether Appellant had a privacy interest in the content of her mailbox and the business address and concluded that no Fourth Amendment violation occurred." This characterization is not entirely accurate. In rejecting Burnette's motion to suppress based on a regulatory violation, the district court noted that "[c]ourts have established that a person has no reasonable expectation of privacy in the information conveyed on the outside of her mail." Where there is no such expectation, the court explained, the Fourth Amendment does not apply. *See, e.g., United States v. Choate,* 576 F.2d 165, 177 (9th Cir.1978) (holding that the use of mail covers to obtain information from the exterior of an individual's mail does not violate the Fourth Amendment given that "the information would foreseeably be available to postal employees"); *accord, e.g., United States v. Hinton,* 222 F.3d 664, 675 (9th

5. Burnette has also submitted a 48–page supplemental pro se brief in which she raises a number of additional challenges to her conviction and sentence. We note that our order of August 28, 2003, granting Burnette's request for a fifth briefing extension reiterated that the pro se supplemental brief was not to

exceed twenty pages and cautioned that a noncompliant brief would not be considered. Nevertheless, we have reviewed Burnette's additional arguments and conclude that they are so meritless that they do not justify discussion. We therefore limit our discussion to the issues raised by counsel.

Cir.2000) ("There is no expectation of privacy in the addresses on a package, regardless of its class."); *United States v. Osunegbu*, 822 F.2d 472, 480 n. 23 (5th Cir.1987) ("[A]n addressee or addressor generally has no expectation of privacy as to the outside of mail.").

■ As defense counsel acknowledged at oral argument, Burnette does not claim to have a protectible privacy interest in the exterior of her mail irrespective of its location. Burnette never raised, and the district court never considered, her present claim that she had a reasonable expectation of privacy in information conveyed on the outside of mail that was enclosed inside a private mailbox in the private mailroom of a CMRA from which she rented postal services. Therefore, we review that claim only for plain error. *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *see* Fed.R.Crim.P. 52(b). To establish plain error, Burnette must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [her] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir.2001).

■ Governmental intrusions do not implicate the Fourth Amendment unless they infringe upon an individual's reasonable expectation of privacy. *Vega–Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir.1997). For Fourth Amendment purposes, "a privacy expectation must meet both subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one which society recognizes as reasonable." *Id.* The Supreme Court has not developed a fixed standard by which to evaluate the objective reasonableness of an asserted expectation of privacy; rather, it has considered such diverse factors as the Framers' intent, the uses to which an individual has put a location, and society's understanding that certain areas warrant protection from governmental intrusions. *See Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). As with other areas of Fourth Amendment analysis, the question of whether a party has a reasonable expectation of privacy is context-specific, and "each case therefore must be judged according to its own scenario." *Vega–Rodriguez*, 110 F.3d at 178.

■ Burnette argues that she had a reasonable expectation of privacy in the three CMRAs from which she rented mail receiving and forwarding services. She suggests that each CMRA was the equivalent of a shared office, the occupants of which have a reasonable expectation that the contents of the office "will not be disturbed except by personal or business invitees." *Mancusi v. DeForte*, 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Even if a CMRA is the Fourth Amendment equivalent of a shared office, however, Burnette would not have a reasonable expectation of privacy in every area inside the postal facility. We have held that "a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." *United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir.1998). Such areas are "exposed both to those who have access to that area and those, including law enforcement officers, who may be given permission to enter that area." *Osunegbu*, 822 F.2d at 479 (citing *United States v. Novello*, 519 F.2d 1078, 1078 (5th Cir.1975), for the proposition that a party has no reasonable expectation of privacy as to the exterior of items stored in a common area of a public warehouse). Likewise, Burnette has no reasonable expectation of privacy in the outside of mail that is sorted or stored in the open, common of-

fice area of a CMRA. *See id.* (noting that an individual has no privacy interest as to the outside of mail addressed to a private mailbox in a private mail facility before the mail is placed in the box).

■ Burnette maintains, however, that her mail was stored in her private mailbox in a private mailroom that was guarded by an attendant at all times. That arrangement, she suggests, "assured that other occupants of the business address did not have free access to the contents of [her] mailbox." Consequently, "the owner of the office service business did not share joint access and control over the contents of [her] mailbox" and "was not authorized to allow others' entrance to [the] mailbox." This scenario presents a more colorable claim that the government agents infringed upon Burnette's reasonable expectation of privacy when they examined the outside of her mail. On the other hand, the Fifth Circuit has rejected a similar claim that the examination by government agents of the contents of a rented mailbox within a private postal facility violated a defendant's reasonable expectation of privacy. *Osunegbu,* 822 F.2d at 480. Ultimately, the reasonableness of Burnette's asserted expectation of privacy may depend upon facts such as the layout of the mailroom and mailboxes, the CMRAs' procedures for mail delivery and storage, and the agreement between the CMRAs and their clients as to access by CMRA managers and third parties to mail inside the mailboxes.

In this case, however, the record does not provide any such details nor does it support Burnette's factual claim that EPA agents examined her mail that was in a private mailbox in a private mailroom. Burnette's motion to suppress was based solely on the claim that government agents violated postal regulations when they obtained information that appeared on the outside of mail that was addressed to her and held at the CMRAs without first obtaining a mail cover. The parties did not present and the district court did not consider evidence regarding the location within the CMRA where Burnette's mail was observed or the procedures employed by CMRA employees in sorting, delivering, and storing their customers' mail.[6] The district court could hardly have been expected to conclude that the government unconstitutionally infringed upon Burnette's reasonable expectation of privacy by examining the contents of her private mailbox when Burnette did not raise, let alone develop, the factual basis to support a claim that her mail was enclosed in a private mailbox over which she had exclusive control or that federal agents examined the contents of such a mailbox.[7]

6. Former defense counsel simply averred at the suppression hearing that the manager of OIS, one of the three CMRAs, gave federal agents access to boxes of mail, leaving them alone in a room to search through those boxes. Counsel did not elaborate upon this statement or present any supporting evidence, and Special Agent Todd testified at the hearing that she could not recall Burnette's mail being made available to her at OIS.

7. Burnette's claim that federal agents violated her reasonable expectation of privacy by examining the contents of her privately-held mailbox within a private mailroom relies on the trial testimony of a receptionist who

worked at OIS. The receptionist testified that she allowed federal agents to enter the mailroom "[j]ust to see where the mail—just to see for themselves if the mailbox was there." She stated that she left the agents in the room with the mailroom attendant and did not know whether they examined or opened any mail. That testimony, which provided no information about the mailroom's layout and operating procedures, the location of Burnette's mail, or the nature of the agents' conduct, was in any event unavailable to the district court when it considered and denied Burnette's motion to dismiss.

Therefore, the district court did not err, let alone commit plain error, by denying Burnette's motion to suppress the evidence derived from the search of the exterior of her mail at the CMRAs.

**B. Inventory Search of Burnette's Bags**

As noted, Special Agent Poltrino testified at the suppression hearing that after Burnette was arrested in her residence in Quechee, Vermont, she asked the agent to bring a black satchel and a black leather briefcase with her to the police station. Burnette objected to this testimony, claiming that she had made no such request. After conducting an evidentiary hearing on the issue, the district court concluded that it found Burnette's assertion unpersuasive and credited Poltrino's testimony that Burnette asked to bring both bags to the station. Therefore, it denied Burnette's motion to suppress evidence derived from the inventory of those bags. *See Illinois v. Lafayette,* 462 U.S. 640, 646–47, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (holding that police may reasonably search the personal effects of a person under lawful arrest as part of the administrative procedure that accompanies booking and jailing).

When reviewing a district court's denial of a motion to suppress, we uphold the court's findings of fact unless they are clearly erroneous. *United States v. Marshall,* 348 F.3d 281, 284 (1st Cir.2003). We accord particular deference to the district court's findings of historical fact which rely on assessments of witness credibility. "Where evaluations of witnesses' credibility are concerned, we are especially deferential to the district court's judgment; we may overturn its decision only if, after reviewing all of the evidence, we have a definite and firm conviction that a mistake has been committed." *United States v. Nee,* 261 F.3d 79, 84 (1st Cir.2001) (citation

and quotation marks omitted). On the other hand, we review the district court's legal conclusions de novo. Thus, "if the lower court applies the wrong legal standard, no deference attaches, and we must proceed to correct the error." *United States v. Rodriguez–Morales,* 929 F.2d 780, 783 (1st Cir.1991).

Burnette claims that the district court found Agent Poltrino's testimony to be incredible but incorrectly concluded that Burnette's failure to present witness testimony on the issue of the bags compelled it to credit Poltrino's testimony. She argues that this conclusion constituted a legal error that undermined the court's factual finding that Burnette requested that the bags be brought to the station. In addition, she argues that the court's finding was not supported by sufficient evidence in the record. Therefore, Burnette claims that the inventory search of her bags was unlawful, requiring the suppression of evidence found inside the bags. Furthermore, because the search warrant for Burnette's Vermont residence was based in part on identification cards that were discovered inside the bags, it was tainted by the illegal evidence, and all evidence obtained pursuant to that warrant should have been suppressed.

Burnette's claims are unpersuasive. First, the district court did not find Poltrino's testimony to be incredible and therefore did not apply an incorrect legal standard. Indeed, in its order denying the motions to suppress, the district court expressly stated:

Burnette claims that she did not ask to take the briefcase and bag to the police station. After holding an evidentiary hearing on this issue, I find her assertion unpersuasive. Instead, I credit Agent Poltrino's testimony that Burnette asked to have both bags brought to the station.

Moreover, the court's statements at the suppression hearing do not indicate, as Burnette suggests, that "the court found Agent Poltrino's testimony 'questionable' and 'inherently improbable'" but incorrectly believed that it was required to credit that testimony in the absence of any defense witness testimony to the contrary. Although the district court opined that asking the officers to bring two bags to the police station did not seem to be a particularly logical request, it explained that it was not "being critical" of Poltrino and that it "ha[d] no reason to question the officer's testimony about it, because there's no one who's testified under oath in front of me, subject to cross-examination, whose credibility I can evaluate on that point." The court did not automatically credit Poltrino's testimony, however, and stated that it would "consider whether the officer's testimony about how the satchel and purse got down to the station is credible or not." It explained that it would "have to make [that] judgment based on the record that [it had]." Thus, based on Poltrino's testimony and other available record evidence, the district court determined that Poltrino was a credible witness and accepted his statement that Burnette asked to have the two bags brought to the station.

■ Burnette also argues that Poltrino's testimony was so internally inconsistent and inherently improbable on its face that the district court's credibility finding was clear error. *See Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (explaining that a reviewing court may find clear error in a factual finding based on a credibility determination where, for example, "[d]ocuments or objective evidence . . . contradict the witness' story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"). In particular, she claims that Poltrino initially testified that Burnette did not use words to indicate that she wanted her bags brought to the station and said nothing at all to the agents besides "okay, or yes, I understand." Burnette argues that "when the judge closely questioned Poltrino about the implausibility of his testimony, Poltrino changed his testimony" and said that Burnette stated expressly: "I want to take some bags with us."

A careful review of the record undercuts Burnette's claim that Poltrino's testimony was internally inconsistent. Poltrino initially stated that Burnette

> indicated she wanted to take a couple of bags with her, and she nodded or motioned—her hands were behind her back. She nodded and motioned to the bags on the floor within a few feet of her that she wanted to take with her to the jail.

That statement, consistent with Poltrino's later testimony, suggests that Burnette indicated verbally that she wished to have some bags taken to the station *and* nodded or motioned to those particular bags with her head. Poltrino later stated that Burnette did not say anything other than "okay, or yes, I understand" in response to being told that she would be taken to the police office for booking; he did not claim that Burnette remained silent while indicating that she wished to bring along the two bags. Thus, Poltrino's testimony was not inconsistent on its face. Nor was that testimony so improbable that a reasonable factfinder would not credit it. Thus, the district court's finding that Burnette requested Poltrino to take her briefcase and bag to the police station was not clearly erroneous.

## C. Jury Instructions

Burnette challenges the district court's denial of her request for an instruction defining reasonable doubt. Burnette's trial counsel requested that the court instruct

the jury as to the meaning of "reasonable doubt." He suggested that the court define the concept as "a doubt that would cause a reasonable person to hesitate, to act in the most importance [sic] of her own affairs." The district court refused to provide a specific definition of the term "reasonable doubt," noting that this court has advised against attempts to define the concept of reasonable doubt. *See, e.g., United States v. Vavlitis,* 9 F.3d 206, 212 (1st Cir.1993) ("Reasonable doubt is a fundamental concept that does not easily lend itself to refinement or definition."); *United States v. Olmstead,* 832 F.2d 642, 645 (1st Cir.1987) ("Most efforts at clarification result in further obfuscation of the concept [of reasonable doubt]. Many definitions reduce the burden of proof on the government by expanding the degree of doubt permissible, and consequently such definitions result in increased appellate litigation.") (internal citations omitted).

■ On appeal, Burnette concedes that a district court is not constitutionally required to define "reasonable doubt" in its instructions to the jury. *See Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994); *United States v. Rodriguez–Cardona,* 924 F.2d 1148, 1160 (1st Cir.1991) ("We have emphasized in the past and do so again here, that reasonable doubt does not require definition."). She argues, however, that the court erred in refusing to further define reasonable doubt in light of its instruction to the jury that: "The jury must never find the defendant guilty on mere suspicion, conjecture or guess." She claims that the juxtaposition of this statement of what reasonable doubt is not with the court's refusal to further define what reasonable doubt is impermis-

sibly eased the government's burden of proof by leading the jury to equate the term "beyond a reasonable doubt" with any belief stronger than a suspicion, conjecture or guess.

Although framed as a challenge to the district court's denial of Burnette's request for an instruction defining reasonable doubt, her argument on appeal is premised upon the claim that the court gave misleading instructions when it stated that a defendant is never to be convicted on "a mere suspicion, conjecture or guess." Since Burnette never objected to this instruction below or mentioned it as a ground for her request for further definition of "reasonable doubt," her present claim was not preserved for appeal.[8] Therefore, we review only for plain error. *United States v. Taylor,* 54 F.3d 967, 972–73 (1st Cir.1995).

■ The district court's statement that "mere suspicion, conjecture, or guess" cannot sustain a guilty verdict did not mislead the jury into believing that the government's burden of proof is less than the reasonable doubt standard. As we have previously explained:

> By itself, the concept of proof "beyond a reasonable doubt" gives the defendant a substantial advantage, which is why defense counsel so often repeat those words in summation. Although the advantage is a legitimate one, it does not seem to us one that is likely to be undermined by an instruction that with a few general phrases indicates that not every doubt is a reasonable one.

*United States v. Whiting,* 28 F.3d 1296, 1303–04 (1st Cir.1994) (upholding jury instruction that included statement that

---

8. Burnette wisely does not argue on appeal that the district court erred in refusing to adopt the specific definition of reasonable doubt that her trial counsel proposed. As the

district court appropriately recognized, this circuit has criticized the "hesitate to act" formulation suggested by defense counsel below. *See Vavlitis,* 9 F.3d at 212.

"reasonable doubt is not a fanciful doubt, nor a whimsical doubt, nor a doubt based on conjecture"). The district court's instructions to the jury referred to "reasonable doubt" more than ten times. They explained that the government has the burden of proving every element of the charges beyond a reasonable doubt. They contrasted this standard with the preponderance of the evidence standard in order to avoid any confusion in the minds of jurors who may have served on civil juries in the past. At the end of the instructions, the court repeated that the defendant must be presumed innocent and that the government is required to prove guilt beyond a reasonable doubt. We find that the judge's instructions, taken as a whole, "adequately apprise[d] the jury of the reasonable doubt standard." *United States v. Johnston*, 784 F.2d 416, 426 (1st Cir.1986) (internal quotation marks omitted). Therefore, the district court did not commit any error, let alone plain error, in referring to the kinds of doubts that would not be reasonable or in denying Burnette's request to further define the concept of reasonable doubt.[9]

### III.

For the foregoing reasons, we uphold the district court's denial of Burnette's motions to suppress. Burnette's conviction and sentence are ***affirmed.***

***So ordered.***

---

9. Because the district court's charge to the jury on the meaning of reasonable doubt did not constitute a clear or obvious error, we do not consider whether it affected Burnette's substantial rights or "threatened the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Colon–Pagan,* 1 F.3d 80, 81 (1st Cir.1993).