United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 17, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-40757
_____

UNITED STATES OF AMERICA

                              Plaintiff-Appellee,

versus

JOSE HERIBERTO RAMIREZ; NELSON RAMIREZ

                              Defendants-Appellants.

--------------------
Appeals from the United States District Court
for the Southern District of Texas
(03-CR-903)
--------------------

Before JOLLY, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

    Defendants-Appellants Jose Heriberto Ramirez ("Jose") and Nelson Ramirez ("Nelson") raise six challenges to their convictions and sentences.  We affirm.

## I.  FACTS & PROCEEDINGS

    In October 2001, Bureau of Immigration and Customs Enforcement ("BICE") Special Agent Victor Hugas received a call from a paid informant, Martin Delgado, who told him that a white Chevrolet Cavalier would deliver a large quantity of marijuana to a "stash

---

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

house" in Brownsville, Texas. Delgado, one of the occupants of the Cavalier, gave Hugas the Cavalier's route and the time frame of the delivery. Delgado testified that he and the other passenger in the Cavalier, his cousin Juan Rodriguez Cardenas, had driven earlier that day to an area near the Rio Grande where they had picked up the marijuana.

Following Delgado's tip, six agents made contact with the Cavalier and followed it to a residence at 420 Esperanza. The agents watched the Cavalier pause in front of a wooden gate at that address. While driving past the property with his passenger, Special Agent Arturo Martinez, Hugas was able to peer over the gate, directly onto the property.[1] Hugas then parked the vehicle three houses away. After several moments, two individuals ⸺ later identified as Jose and Nelson Ramirez ⸺ were seen to walk out of 420 Esperanza and open the gate to allow the Cavalier access to the property. Delgado and Cardenas drove the Cavalier in and parked it in front of the carport. Delgado got out of the Cavalier, opened the trunk, and ⸺ with the assistance of Nelson ⸺ removed the marijuana from the trunk. The Cavalier remained in the

---

[1] Hugas testified at the suppression hearing that the gate was approximately four feet high. Photographs of the property show that the gate is ineffective as any sort of visual barrier to the property. The right hand side of the gate – which opens outward toward the street – connects to a utility pole at the sidewalk. There is no additional barrier from the utility pole to 420 Esperanza, leaving a wide gap through which agents could observe the activities on the property.

carport for one to three minutes, then left.  The gate was closed behind it.

Contiguous to the left side of 420 Esperanza is a canal.[2]  A fence separates the house and the canal.  A gate in the fence allows access to the canal from the backyard of the house.  After the Cavalier left, a Southern Union Gas truck — which had been parked in the driveway — backed into the street and parked to the left of 420 Esperanza, next to the canal.  The driver — defendants' brother, Jesus Ramirez — placed orange cones at each end of the truck, turned on the hazard lights, and stood next to the vehicle.  Hugas testified that he watched Jose leave the carport area, walk around the utility pole at the left corner of the property, descend into the canal, then ascend out of the canal.  According to Hugas, Jose repeated this act approximately three times.  Hugas testified that he did not see Jose carrying any object but that he stopped at the gas truck and spoke to Jesus.

After approximately thirty to forty minutes of surveillance, all of the agents approached the house.[3]  There, they encountered Jesus, Jose, and Nelson.  The agents told the brothers that they

---

[2] The parties also refer to the canal as a ditch.

[3] Supervisory Agent Joseph Celaya testified that during surveillance, he received a call notifying him that a vehicle was leaving the premises.  Together with Supervisory Agent Danny Ibarra, Celaya followed the vehicle to Duran's Grocery Store ("Duran's").  The events at Duran's are irrelevant for purposes of this appeal because they relate to the issue of Jose's consent to search 420 Esperanza, which, as we note below, we do not reach.

3

(the agents) had reason to believe that the brothers were in possession of narcotics. The agents presented Jose with a United States Customs Service Consent to Search form, which they explained to him. After Jose signed that form, the agents proceeded to search 420 Esperanza. The search produced no evidence of marijuana in either the ground floor of the house or the carport.

In Nelson's room, the agents found an empty Beretta pistol case and a 40-millimeter magazine. The agents also discovered a safe in Nelson's room, which he opened for them. Inside the safe was approximately $7,000 in cash. Nelson told the agents that the cash was proceeds from a recent sale of a car. The agents did not seize or count the cash. After completing their search of the house, the agents searched the backyard area within the fence, including the interior of a shed that they discovered there. They found no marijuana.

Two apartments are located on the second story of 420 Esperanza. The doors to the apartments are located off the balcony above the carport. Agents secured consent from the upstairs residents to search the two apartments. In the apartment occupied by Vanessa and Jose Garcia, agents discovered a large roll of shrink wrap, well-known drug paraphernalia.

Hugas testified that, after the white Cavalier had left, agents had observed Nelson standing on the balcony above the carport. The balcony leads to the upstairs apartments. During the course of the search, Hugas went to the balcony. At the location

4

where Nelson had been seen standing, Hugas found a loaded 9-millimeter Glock pistol and extra magazine lying on a small ledge underneath the handrail, at foot level. Hugas testified that, in addition to access from the balcony, anyone standing at ground level in the carport could easily reach up and retrieve the gun from the ledge.

From his vantage point on the balcony, Hugas also noticed that some of the foliage around the drainage canal was crushed. The agents proceeded from 420 Esperanza toward the canal to continue their search, passing through the backyard gate in the fence and down into the canal. In it they discovered a press, which, according to Hugas, was the kind used to press leafy marijuana into brick form. No evidence was presented, however, that the press contained any marijuana residue.

In the canal, the agents also discovered several loose bundles of marijuana partially hidden by ground cover and wrapped in cellophane. A black plastic bag containing two more bundles of marijuana was discovered as well.

After finding the marijuana, the agents returned to the house. They advised the three brothers of their constitutional rights and obtained Jose's signature on an advice-of-rights form. Hugas and Special Agents Arturo Martinez and Jaime Cavazos then interviewed Jose in the presence of Nelson and Jesus. Jose denied any knowledge of the marijuana. When asked about the firearm, Jose informed the agents that he was a felon and was not allowed to

5

possess a firearm. He also denied any knowledge of the white Cavalier; yet when the agents informed him that they had conducted a surveillance of the house, Jose told the agents that the occupants of the Cavalier had business with the tenants of the upstairs apartments. When the agents again asked Jose about the marijuana found in the canal, he stated that the high volume of narcotics activity in the area was the reason that he wanted to move from 420 Esperanza. Although Nelson was present, the agents did not interview him. After the agents completed their interview with Jose, they left. Hugas testified that because no agent had seen either Jose or Nelson handle the marijuana, the agents had no probable cause to arrest either defendant at that time.

The next morning, Agent Martinez and several canine enforcement officers returned to the canal, where they discovered more marijuana. During the course of all their searches, the agents seized a total of 82.25 kilograms — or 182 pounds — of marijuana.

In July 2002, Agents Hugas's continuing investigation of the marijuana discovered in the canal led him to Cameron County Jail, where he interviewed Juan Rodriguez Cardenas. When Hugas informed Cardenas that they knew that he had been in the white Cavalier on October 9, 2001, Cardenas agreed to cooperate in the investigation. Before he could do so, however, Cardenas was deported.

In October 2003, Cardenas returned to the United States. When Hugas discovered Cardenas at his home, he renewed his offer to

6

assist in the investigation. Hugas arrested Cardenas for unlawful re-entry. At the police station, Hugas presented Cardenas with a photographic array, from which he identified both Jose and Nelson as the two men who had helped unload the marijuana from the Cavalier.

The grand jury returned a two-count indictment against Jose, Nelson, and Jesus, charging each with (1) conspiracy to possess with intent to distribute approximately 82.25 kilograms of marijuana in violation of 21 U.S.C. § 846, and (2) possession with intent to distribute approximately 82.25 kilograms of marijuana in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(C). Jose and Nelson pleaded not guilty, but Jesus pleaded guilty and is not involved in this appeal.

Jose and Nelson filed motions to suppress the marijuana discovered in the canal and the handgun found on the ledge by the balcony. They contended that the agents obtained the evidence in violation of defendants' Fourth Amendment rights. They also moved to suppress statements allegedly taken in violation of their Fifth Amendment rights. After two hearings on the motions to suppress, the district court denied them.

At the end of defendants' trial, the jury found them guilty on each count. They filed a motion for a new trial, which the district court denied. The district court ordered pre-sentence investigation reports ("PSR"). Defendants lodged several objections to the PSRs, all of which the district court overruled.

7

The court sentenced Jose to concurrent 92-month terms of imprisonment and Nelson to concurrent 70-month terms of imprisonment. Defendants timely appealed.

## II. ANALYSIS

### A.   Motion to Suppress

#### 1.   Standard of Review

"In considering a ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, de novo."[4]  We view the evidence in the light most favorable to the prevailing party below, here, the government.[5]

#### 2.   Merits of the Motion

Defendants assert that the district court erred when it concluded that the search and the ensuing seizure of the marijuana did not implicate the Fourth Amendment because the agents had found and seized the marijuana in an "open field" and not within the protected curtilage of 420 Esperanza.[6]  Specifically, they contend

---

[4] United States v. Chavez, 281 F.3d 479, 483 (5th Cir. 2002) (citing United States v. Carreon-Palacio, 267 F.3d 381, 387 (5th Cir. 2001)).

[5] United States v. Reyes, 349 F.3d 219, 222 (5th Cir. 2003) (citing United States v. Jordan, 232 F.3d 447, 448 (5th Cir. 2000)).

[6] Defendants challenged the admission of both the marijuana and the handgun and ammunition on Fourth Amendment grounds in their motions to suppress in the district court. Before us, defendants

8

that Hugas was at an unlawful vantage point — the balcony — when he noticed the crushed foliage that led the agents to search the canal.

Applying the four-part test announced in <u>United States v. Dunn</u>,[7] the district court held that the marijuana was not within the protected curtilage of 420 Esperanza. The court concluded that "[l]ying outside the 'curtilage' as it does, the drainage canal is an 'open field' for Fourth Amendment purposes." Accordingly, the district court held that the search of the canal did not implicate the Fourth Amendment. We agree.

In <u>Hester v. United States</u>, the Supreme Court held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields."[8] Although <u>Katz v. United States</u>[9] — which redirected Fourth Amendment analysis to an individual's "constitutionally protected reasonable expectation of privacy" —

---

appeal the denial of their motions to suppress only to the extent that the district court did not suppress the marijuana. They raise no Fourth Amendment challenge to the district court's ruling on the handgun and ammunition. They have therefore abandoned this argument. <u>Yohey v. Collins</u>, 985 F.2d 222, 224-25 (5th Cir. 1993) ("Yohey has abandoned these arguments by failing to argue them in the body of his brief."). Defendants challenge the district court's admission of the handgun and ammunition on <u>evidentiary</u>, as opposed to <u>Fourth Amendment</u>, grounds.

[7] 480 U.S. 294 (1987).

[8] 265 U.S. 57, 59 (1924).

[9] 389 U.S. 347, 360 (1967).

called into question the "open fields" doctrine, the Supreme Court reaffirmed its vitality in <u>Oliver v. United States</u>.[10] In <u>Oliver</u>, the Court explicitly held that "no expectation of privacy legitimately attaches to open fields."[11]

In contrast to open fields, the Fourth Amendment does extend its protection to the curtilage of the home.[12] The Supreme Court has defined curtilage as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'"[13] To determine the extent of the curtilage, courts have "reference[d] . . . the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."[14] The Court has announced four non-exclusive factors to aid us in determining whether a particular area lies within the curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether that area is within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) any steps

---

[10] 466 U.S. 170 (1984).

[11] <u>Id.</u> at 180.

[12] <u>See id.</u>

[13] <u>Id.</u> (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886)).

[14] <u>Id.</u>

taken by the resident to obscure the area from observation by passersby.[15]

The district court correctly held that the majority of the four factors weigh in favor of the conclusion that the canal is not part of the curtilage and is thus an "open field." The canal was not within an enclosure surrounding the house.[16] Indeed, it lay outside the fence that surrounds the property at 420 Esperanza.[17] In addition, defendants never used the canal for any purpose whatsoever.[18] Although defendants testified that at some point in the past they maintained the canal area, Nelson later testified that they do not use it on any regular basis for any purpose. There was certainly no testimony that defendants used the canal "for intimate activities of the home."[19] Further, defendants have done nothing to protect the area from observation by the public.[20] No barrier prohibits public access to or view of the canal, and anyone can enter it from two different public streets.

---

[15] Dunn, 480 U.S. at 301.

[16] See id.

[17] See id. at 302 ("It is also significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence.").

[18] See id.

[19] See id.

[20] See id. at 303.

11

Although the proximity of the canal to the house —— approximately 30 feet —— weighs in defendants' favor, the other three factors indicate that the canal is not part of the curtilage. Standing alone, the mere fact that the canal is close to defendants' home does not bring it within the curtilage: "It is clear, however, that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech."[21] As the canal is an "open field," as that term is used in Fourth Amendment parlance, the agents' search of the canal and seizure of the marijuana in it did not violate the Fourth Amendment.

Defendants nevertheless contend that Agent Hugas initially observed the "open field" from the curtilage of 420 Esperanza. Specifically, defendants assert that "the agents would not have found the contraband but for the observations made and facts learned as a result of their unlawful and warrantless entry into the Appellant's residence." Defendants' argument that a government agent must first observe any alleged contraband from a lawful vantage point —— i.e., an open field —— has support in the case law. We and other courts have held that <u>if the agents are standing in an open field</u> when they view the alleged contraband, the Fourth

---

[21] <u>Oliver</u>, 466 U.S. at 180 n. 11.

12

Amendment is not implicated.[22] As Agent Hugas was not in an open field when he observed the canal, we must determine whether he observed the crushed foliage, which first prompted the search of the canal, from a lawful vantage point.

We reject defendants' vantage-point argument on two grounds.[23] First, the testimony presented at the hearing on the motion to suppress shows that the agents initially observed suspicious activity concerning the canal from their lawful vantage point outside of the curtilage, well before the agents entered onto the curtilage, and even further before Hugas ascended the stairs to the balcony. Recall that Agent Hugas testified that after the white Cavalier left the carport, Jesus pulled his Southern Union Gas

_____

[22] See United States v. Pace, 955 F.2d 270, 275 (5th Cir. 1992) ("However, the holding of Dunn was that once the officers were standing in open fields outside the curtilage of the home, they were privileged to view the inside of the barn." (emphasis added)); see also Daughenbaugh v. City of Tiffin, 150 F.3d 594, 601 (6th Cir. 1998) ("In fact, the Dunn Court simply held that officers could observe either open fields or curtilage as long as the vantage point of the observation was outside the curtilage. . . . The broadest principle that may be inferred from the Dunn opinion is that officers may constitutionally view a protected area as long as they make their observations from a lawful vantage point — i.e., a place located outside of the curtilage."); United States v. Traynor, 990 F.2d 1153, 1157 (9th Cir. 1993) ("Under Dunn and Pace, it does not matter that officers first trespass upon property that is obviously curtilage . . . while investigating a tip, as long as the incriminating observations themselves take place outside the protected curtilage."), overruled on other grounds by United States v. Johnson, 256 F.3d 895 (9th Cir. 2001) (en banc).

[23] The district court held that Jose's consent was irrelevant to the motion to suppress. As the two grounds that we discuss are dispositive, we do not reach Jose's argument that his consent to search 420 Esperanza was invalid.

truck out of the driveway, parking it on the public street in front of the canal; that Jesus placed cones in front of and behind the truck; that he turned on the truck's hazard lights; and that agents watched as Jose walked to the truck, talked to Jesus at the rear of the truck and then went back and forth into and out of the canal approximately three times. Coupled with the agents' other surveillance observations from a lawful vantage point — a public street — and the confidential informant's tip, the agents had "the requisite level of cause" to search the "open field," which is itself bereft of Fourth Amendment protection.[24] That Agent Hugas's curiosity was further piqued by his subsequent view of the canal from the balcony is of no consequence.

We also conclude independently — as did the district court — that defendants had no reasonable expectation of privacy in the balcony at 420 Esperanza. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'"[25] Under the standard enunciated in Katz, "[o]ur Fourth Amendment analysis embraces two

---

[24] See, e.g., United States v. Sanchez, 689 F.2d 508, 513 (5th Cir. 1982) ("While information supplied by an informant of unknown reliability, standing alone, clearly does not establish probable cause . . ., corroboration of that information by independent observations (either) substantiating the details of the tip (or) . . . of activity reasonably arousing suspicion itself may establish the requisite level of cause to warrant a search.") (internal citations and quotations omitted)).

[25] California v. Ciraolo, 476 U.S. 207, 211 (1986) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

14

questions.  First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he [sought] to preserve [something] as private. . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable."[26]  To show that they had a constitutionally protected expectation of privacy, then, defendants had to demonstrate both that they attempted to preserve something as private (subjective) and that society recognizes their expectation of privacy as reasonable (objective).[27]  Whether a person possesses a reasonable expectation of privacy is context-specific, and "'each case must be judged according to its own scenario.'"[28]

Here, defendants have failed to demonstrate that they had a subjective expectation of privacy in the balcony at 420 Esperanza. When testing common, or public, areas — those areas to which the public and others, such as law enforcement officers, have access — courts generally hold that a party possesses no reasonable

---

[26] Bond v. United States, 529 U.S. 334, 338 (2000) (citations and internal quotations omitted).

[27] See Kee v. City of Rowlett, Tx., 247 F.3d 206, 212 (5th Cir. 2001).

[28] United States v. Burnette, 375 F.3d 10, 16 (1st Cir. 2004) (quoting Vega Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997)), vacated on other grounds, 125 S. Ct. 1406 (2005) (vacating and remanding in light of United States v. Booker, 125 S. Ct. 738 (2005)).

expectation of privacy and that the Fourth Amendment is thus not implicated.[29]

On the record here, defendants possessed no reasonable expectation of privacy in the common balcony area on the second floor above the carport. The area is accessible to anyone and everyone — the upstairs tenants, visitors, solicitors, and even law enforcement officers who might wish to question a second-floor tenant. Indeed, the entrances to the two upstairs apartments can be reached only via the balcony. In addition, defendants have no means by which to exclude anyone from the second-floor balcony. As

---

[29] See, e.g., Burnette, 375 F.3d at 16 ("We have held that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building. Such areas are exposed both to those who have access to that area and those, including law enforcement officers, who may be given permission to enter that area." (quotations and internal citations omitted)); United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building."); United States v. Nohara, 3 F.3d 1239, 1242 (9th Cir. 1993) ("However, we join the First, Second, and Eighth Circuits which have rejected this rationale and held an apartment dweller has no reasonable expectation of privacy in the common areas of a building whether the officer trespasses or not."); United States v. Acosta, 965 F.2d 1248, 1252 (3rd Cir. 1992) ("Thus, the inner hallway was easily accessible to tenants, visitors, solicitors, workmen and other members of the public. On the record, defendants had no way to exclude anyone and, therefore, could not have reasonably expected their privacy to extend beyond their apartment door."); United States v. DeWeese, 632 F.2d 1267, 1270 (5th Cir. 1980) ("Nevertheless, in an area to which access is freely given to all properly and lawfully within the close, it is apparent that, as to them, a reasonable expectation of privacy does not exist in the common area.");

Many of these cases are commonly referred to as the "apartment cases." See United States v. Anderson, 154 F.3d 1225, 1232 n. 3 (10th Cir. 1998).

16

noted, the gate that leads to the carport does not restrict pedestrian access to the property in general or to the stairs that lead to the second floor in particular. Anyone who wishes to proceed to the second floor of 420 Esperanza may do so freely without hindrance and must do so by way of the stairs and the balcony. The conclusion is inescapable that defendants could have possessed no reasonable expectation of privacy in the second floor balcony from which Agent Hugas viewed the crushed foliage in the adjacent canal. Absent a valid expectation of privacy by defendants, Agent Hugas was standing at a lawful vantage point when he viewed the crushed foliage. The district court did not err when it denied defendants' motions to suppress.

## B. Admissibility of the Handgun and the Ammunition

### 1. Standard of Review

We review a district court's determination as to the admissibility of evidence for abuse of discretion.[30] In a criminal case, however, our standard of review of the district court's evidentiary rulings is necessarily heightened.[31] If we find an abuse of discretion in the admission or exclusion of evidence, we review the error under the harmless error doctrine.[32] Under this

---

[30] United States v. West, 22 F.3d 586, 591 (5th Cir. 1994).

[31] United States v. Hernandez-Guevara, 162 F.3d 863, 869 (5th Cir. 1998).

[32] United States v. Haese, 162 F.3d 359, 364 (5th Cir. 1998) (citing United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996)).

17

standard, we must affirm an evidentiary ruling unless it affects a substantial right of the complaining party.[33]

## 2. Analysis

Agent Hugas discovered a Glock 9-millimeter handgun and ammunition magazine in plain view from the balcony. They were on a small ledge above the carport at 420 Esperanza. Defendants insist that the district court abused its discretion when it admitted the handgun and magazine because no evidence connected it to either appellant. Jose and Nelson point out that the evidence was not discovered (1) inside their residence, (2) on their persons, or (3) in an area within their exclusive control. Defendants also note that the evidence was discovered outside the second-story balcony of the two-story structure, on a floor containing two other apartments occupied by third parties. Nelson further notes that the Glock 9-millimeter is not the type of gun that would fit in the Beretta gun case that the agents found in his room.

Defendants contend that under Federal Rules of Evidence 403 and 404(b), the firearm, whether intrinsic or extrinsic evidence, is inadmissible because the unfairly prejudicial effect outweighs any probative value. The government's only response is that the district court properly admitted the firearm based on courts'

---

[33] See id.

recognition that firearms are "'tools of the trade' of those engaged in illegal drug activities."[34]

We first address whether the firearm and ammunition is intrinsic or extrinsic evidence. Evidence of extraneous acts is "'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or other acts were necessary preliminaries to the crime charged."[35] A district court may admit intrinsic evidence to permit the jury to evaluate all the circumstances under which a defendant may have acted.[36] Federal Rule of Evidence 404(b) does not apply to intrinsic-act evidence.[37]

We conclude, however, that the evidence of the handgun and ammunition is not intrinsic. There is no evidence that the handgun and ammunition found by Hugas was "inextricably intertwined" with the drug trafficking and possession offenses; neither was it part

---

[34] See United States v. Martinez, 808 F.2d 1050, 1057 (5th Cir. 1987).

[35] United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990) (citing United States v. Torres, 685 F.2d 921, 924 (5th Cir. 1982)).

[36] See United States v. Royal, 972 F.2d 643, 647 (5th Cir. 1992).

[37] United States v. Powers, 168 F.3d 741, 749 (5th Cir. 1999) (citing United States v. Garcia, 27 F.3d 1009, 1014 (5th Cir. 1994)).

19

of a single criminal episode or preliminary to the drug offenses charged.  We thus deduce that the evidence had to be extrinsic.[38]

Federal Rule of Evidence 404(b) —— which does apply to extrinsic evidence —— states, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .[39]

We have articulated a two-part test to determine whether a district court properly admits extrinsic evidence: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character.  Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403."[40]

Under Beechum, we must determine whether the evidence of the firearm and ammunition is relevant to an issue other than defendants' character.  Before doing so, however, we must first

---

[38] See United States v. Townsend, No. 97-60491, 1999 WL 427597, at *8 (5th Cir. June 24, 1999) (opinion withdrawn from publication).

[39] FED. R. EVID. 404(b).

[40] Hernandez-Guevara, 162 F.3d at 870 (citing United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)).
Federal Rule of Evidence 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . . FED. R. EVID. 403.

20

decide whether the government offered sufficient proof that defendants committed the extrinsic acts in question.[41] "If the proof is insufficient, the judge must exclude the evidence because it is irrelevant."[42] Here, the undisputed testimony of Agent Hugas revealed that, during surveillance, the agents observed Nelson Ramirez on the second floor balcony where the gun was discovered. Further, the firearm and ammunition were discovered in the vicinity of the carport —— where they were accessible by hand to anyone standing underneath the carport, the area at which defendants offloaded the marijuana. Although no direct evidence demonstrated that either defendant physically handled the firearm or ammunition, "this Court has held that the Government is only obliged to show that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking; a showing that the weapon was used, handled or brandished in an affirmative manner is not required."[43] Ample circumstantial evidence linked the handgun and ammunition spatially to the defendants and the events that transpired in the vicinity of the carport at 420 Esperanza, viz., unloading marijuana from the trunk of the Cavalier.

---

[41] Beechum, 582 F.2d at 912-13.

[42] Id. at 913.

[43] United States v. Molinar-Apodaca, 889 F.2d 1417, 1424 (5th Cir. 1989).

21

In addition, under Beechum's first prong, the evidence is clearly relevant to an issue other than defendants' character. The accessibility of the firearm and ammunition to anyone in or around the carport, and Nelson's position on the balcony near where these items were found, inferentially illustrate defendants' intent to participate in a drug trafficking crime.[44]

Neither do we conclude that any unfairly prejudicial effect of the firearm and ammunition could outweigh its probative value. We have consistently held that firearms are "tools of the trade" of drug traffickers.[45] Proximity or accessibility of firearms is therefore highly probative of criminal intent.[46] The district court did not abuse its discretion when it admitted evidence of the handgun and the ammunition.

## C. Jose's Prior Convictions

At trial, Texas state parole official Cristela Dow testified that Jose had two prior convictions, one for possession of 1,175 pounds of marijuana, for which he was assessed a six-year term of imprisonment, and another for felonious possession of dangerous drugs, for which he was sentenced to seven years probation. Jose argues that under Federal Rule of Evidence 404(b), his two prior

---

[44] See United States v. Beverly, 921 F.2d 559, 563 (5th Cir. 1991) (holding, in context of conviction under 18 U.S.C. § 924(c)(1), that presence of guns and ammunition illustrate intent to facilitate drug trafficking crimes).

[45] See id.

[46] Martinez, 808 F.2d at 1057.

22

convictions were irrelevant to the crime for which he was on trial here. The government notified the district court that it intended to offer evidence of Jose's prior convictions to demonstrate his intent and knowledge of the instant offenses. Jose counters that because the government offered only the fact of the prior convictions and the sentences assessed, these aspects are not probative of his knowledge and intent. Further, Nelson insists that the admission of Jose's prior convictions prejudiced him (Nelson) because they did not involve him. To determine whether the district court properly admitted Jose's prior convictions, we apply the same standard of review enunciated above.[47]

In deciding whether the district court abused its discretion, we use the two-part <u>Beechum</u> test. First, we must conclude that the prior convictions are relevant to an issue other than the defendant's character.[48] "Once it is determined that the extrinsic offense requires the same intent as the charged offense," the extrinsic evidence "satisfies the first step" of <u>Beechum</u>.[49] "If offered to show intent, relevancy of the extrinsic evidence is determined by comparing it to the state of mind of the defendant in

---

[47] <u>See United States v. Jackson</u>, 339 F.3d 349, 354 (5th Cir. 2003) (citing <u>United States v. Wisenbaker</u>, 14 F.3d 1022, 1028 (5th Cir. 1994)).

[48] <u>Beechum</u>, 582 F.2d at 911.

[49] <u>Id.</u> at 913.

23

perpetrating the respective offenses."[50]  As Jose pleaded not guilty, he placed his intent at issue.[51]  Accordingly, because Jose's prior convictions for possession of controlled substances required the same intent as the federal possession and intent-to-distribute crimes with which he was charged here, his prior convictions were relevant to an issue other than his character under Rule 404(b).[52]  The first step of Beechum is satisfied.

Under the second step of Beechum, we must decide whether the probative value of the evidence outweighs any possible unfair prejudice.[53]  "The probative value of extrinsic offense evidence 'must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference.'"[54]  As the prosecution presented little evidence of Jose's intent apart from his prior convictions, the probative value of these convictions was greater.[55]  In addition, because Jose and Nelson strenuously attacked the credibility of the

---

[50] United States v. Duffaut, 314 F.3d 203, 209 (5th Cir. 2002) (citing United States v. Gordon, 780 F.2d 1165, 1173 (5th Cir. 1986)).

[51] United States v. Thomas, 348 F.3d 78, 85 (5th Cir. 2003); United States v. Chavez, 119 F.3d 342, 346 (5th Cir. 1997).

[52] Duffaut, 314 F.3d at 209.

[53] Beechum, 582 F.2d at 911.

[54] United States v. Buchanan, 70 F.3d 818, 831 (5th Cir. 1996) (quoting Beechum, 582 F.2d at 914).

[55] See id.

government's informant, they "enhance[d] the probity of the prior offense evidence by placing [their] intent and state of mind at issue."[56]   And, because the district court issued a limiting instruction —— both when the evidence was admitted and again in the final charge —— regarding the extent that the jury could consider the prior convictions, the court reduced any likelihood of prejudice as to both Jose and Nelson.[57]  We have consistently held that "evidence of a defendant's prior conviction for a similar crime is more probative than prejudicial and that any prejudicial effect may be minimized by a proper jury instruction."[58]  We reject defendants' evidentiary challenge to the admission of Jose's prior convictions.

## D.   The "Deliberate Ignorance" Instruction

### 1.   Standard of Review

We review a challenge to a deliberate ignorance instruction "'using the standard of whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to principles of law applicable to the factual issues

---

[56] Id.

[57] Thomas, 348 F.3d at 86; Duffaut, 314 F.3d at 210; Buchanan, 70 F.3d at 831.
Indeed, as to Nelson's argument that the admission of Jose's prior convictions prejudiced him, the limiting instruction specifically provided that the prior offenses did not pertain to every defendant on trial.

[58] United States v. Taylor, 210 F.3d 311, 318 (5th Cir. 2000).

25

confronting them.'"[59]   To determine whether the evidence supports a deliberate ignorance instruction, "the court should examine the evidence and all reasonable inferences therefrom in the light most favorable to the government."[60]

Here, we review defendants' objection for plain error only, as neither defendant objected contemporaneously to the district court's deliberate ignorance instruction.[61]   Plain error review entails a determination (1) whether an error existed; (2) if it did, whether it is clear and plain; (3) if it is, whether it affected the defendant's substantial rights; and (4) if it did, whether it affects the fairness, integrity, or public reputation of judicial proceedings.[62]

## 2.   Merits of Claim of Error

Defendants assert that the district court erred by giving the jury an instruction regarding deliberate ignorance.[63]   As   "[t]he

_____

[59] United States v. Saucedo-Munoz, 307 F.3d 344, 348 (5th Cir. 2002) (quoting United States v. Wisenbaker, 14 F.3d 1022, 1027 (5th Cir. 1994)).

[60] United States v. Cartwright, 6 F.3d 294, 301 (5th Cir. 1993) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).

[61] See FED. R. CRIM. P. 30(d) & 52(b).

[62] United States v. Miranda, 248 F.3d 434, 443 (5th Cir. 2001).

[63] The deliberate ignorance instruction read as follows: You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the defendants cannot be established merely by demonstrating that the defendants were negligent, careless or foolish, knowledge can be

26

instruction allows the jury to convict without finding that the defendant actually was aware of the existence of illegal conduct," we have noted that, "[w]here, as here, the mens rea required for conviction is that the defendant acted 'knowingly' or 'intentionally,' a deliberate ignorance instruction creates a risk that the jury might convict for negligence or stupidity."[64]

As a deliberate ignorance instruction could confuse the jury, it "should rarely be given."[65] A district court may properly issue a deliberate ignorance instruction when the evidence demonstrates "(1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct."[66]

Jose and Nelson's defense proceeded on a theory that both defendants were entirely unaware of any drug-related activity that occurred at 420 Esperanza. Trail testimony of the government's witnesses — credited by the jury — put both defendants in the vicinity of the carport when the Cavalier arrived. The defendants opened the gate to allow the Cavalier access to the property. The

---

inferred if the defendants deliberately blinded themselves to the existence of a fact.

[64] Id. at 347-48 (citing Cartwright, 6 F.3d at 301.

[65] United States v. Obejode, 957 F.2d 1218, 1229 (5th Cir. 1992).

[66] United States v. Threadgill, 172 F.3d 357, 368 (5th Cir. 1999) (citing United States v. Cavin, 39 F.3d 1299, 1310 (5th Cir. 1994)).

Cavalier was at 420 Esperanza for only several minutes. Immediately after the Cavalier pulled onto the property, its trunk, which contained the marijuana, was open, and both defendants were present. The unloading of the marijuana therefore occurred in the immediate vicinity and view of defendants. Indeed, there was testimony from Martin Delgado and Juan Cardenas that both defendants were present when the marijuana was unloaded and that one of them helped. The agents also observed Jose traveling back and forth between the carport area and the canal where the marijuana was later found. As defendants advanced the theory that they were unaware of any drug-related activity, the trial court did not plainly err in delivering a deliberate ignorance instruction: The defense of unawareness certainly could amount to a "charade of ignorance" that the jury could have considered "as circumstantial proof of guilty knowledge."[67]

Further, "[a]lthough our caselaw [sic] prohibits a deliberate ignorance instruction where there is evidence of only actual knowledge, we are unaware of any cases suggesting that a deliberate ignorance instruction is improper where evidence may be construed as showing either actual knowledge or contrivance to avoid learning the truth."[68] Our precedent thus allows a district court to issue

---

[67] United States v. Moreno, 185 F.3d 465, 476 (5th Cir. 1999) (quoting United States v. McKinney, 53 F.3d 664, 676 (5th Cir. 1995)) (internal quotations omitted).

[68] Saucedo-Munoz, 307 F.3d at 349 (emphasis in original) (internal citation omitted).

28

a deliberate ignorance instruction alongside evidence of actual knowledge.[69]  As the evidence strongly suggests that Jose and Nelson had actual knowledge of the unloading of the marijuana — indeed, that they participated in unloading it — they, as defendants who claimed ignorance as a defense, "should not be able to avoid a deliberate indifference instruction because [their] conduct might also be construed as evincing actual knowledge."[70]  The district court did not err when it gave the jury a deliberate ignorance instruction.

## E.    Sufficiency of the Evidence

### 1.    Standard of Review

We must affirm a conviction in the face of a challenge to the sufficiency of the evidence "if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt."[71]  We consider the evidence, all reasonable inferences drawn from that evidence, and all credibility determinations in the light most favorable to the non-moving party, here, the government.[72]  We neither weigh the evidence nor assess the credibility of the witnesses.[73]  "The evidence need not exclude

---

[69] See id. at 349 & n. 3 (listing cases).

[70] Id.

[71] United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996 (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

[72] Id. (citing Glasser, 315 U.S. at 80).

[73] See id.

29

every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."[74]  If the evidence lends equal support to a finding of guilt or innocence, however, we must reverse because under these circumstances, "a reasonable jury must necessarily entertain a reasonable doubt."[75]

## 2.    Merits of the Claim of Insufficient Evidence

To prove the existence of a conspiracy to possess with the intent to distribute marijuana under 21 U.S.C. § 846, the government must prove three elements beyond a reasonable doubt: (1) that an agreement existed to violate the federal narcotics laws; (2) that the defendant knew of the existence of the agreement; and (3) that the defendant voluntarily participated in the agreement.[76]

Proof that the defendants possessed marijuana with the intent to distribute it requires the government to show (1) possession of the controlled substance, (2) knowledge, and the (3) requisite intent to distribute.[77]   Proof that defendants aided and abetted the crime of possession of marijuana with the intent to distribute it pursuant to 18 U.S.C. § 2, requires the government to show that

---

[74] Id. (citing United States v. Salazar, 66 F.3d 723, 728 (5th Cir. 1995)).

[75] Id. (quoting United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992)) (emphasis in original).

[76] United States v. Brackett, 113 F.3d 1396, 1399 (5th Cir. 1997).

[77] Cartwright, 6 F.3d at 299.

30

"'(1) the defendant associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed.'"[78] "Association means that the defendant shared in the criminal intent of the principal."[79] "Participation means that the defendant engaged in some affirmative conduct designed to aid in the venture."[80] For both intent to distribute and aiding and abetting, proof must be beyond a reasonable doubt.

Defendants' principal challenges to the sufficiency of the evidence concern the (1) knowledge/intent, and (2) possession elements of the offenses. Defendants correctly note that "'presence at the crime scene or close association with conspirators, <u>standing alone</u>, will not support an inference of participation in the conspiracy.'"[81] It is equally well-established, however, that "presence or association is a factor that, <u>along with other evidence</u>, may be relied upon to find conspiratorial activity by the defendant."[82]

---

[78] <u>United States v. Sorrells</u>, 145 F.3d 744, 753 (5th Cir. 1998) (quoting <u>United States v. Gallo</u>, 927 F.2d 815, 822 (5th Cir. 1991)).

[79] <u>United States v. Salazar</u>, 66 F.3d 723, 729 (5th Cir. 1995).

[80] <u>Id.</u>

[81] <u>United States v. Gonzales</u>, 121 F.3d 928, 935 (5th Cir. 1997) (quoting <u>United States v. Maltos</u>, 985 F.2d 743, 746 (5th Cir. 1992)) (emphasis added).

[82] <u>Id.</u> (quoting <u>United States v. Cardenas</u>, 9 F.3d 1139, 1157 (5th Cir. 1993)) (emphasis added).

31

As to the conspiracy count, the confidential informant, Martin Delgado, explicitly testified that the defendants opened the gates of 420 Esperanza for the white Cavalier and that Nelson assisted in the unloading of the marijuana from the car's trunk. Juan Cardenas, Delgado's cousin and the other passenger in the Cavalier, testified to the same facts. Agents Hugas and Kristin Rosenbeck testified that both Jose and Nelson opened the gate at 420 Esperanza. Agent Martinez, the passenger in Hugas's vehicle, testified that the trunk of the Cavalier was open as their surveillance vehicle passed by 420 Esperanza moments after the vehicle parked under the carport.

Delgado also testified that Nelson and Jose were present when the bundles were unloaded from the trunk and that the bundles smelled of marijuana. Cardenas too testified that both defendants were present at this time, and that Delgado and defendants offloaded the marijuana.

Agents observed Jose repeatedly entering and exiting the canal in which the agents eventually discovered the marijuana. Evidence admitted at trial revealed that the packages discovered in the canal were the same bundles that defendants had helped unload from the Cavalier. When all this evidence is viewed as a whole, it is more than sufficient to support the convictions of both Jose and Nelson on the conspiracy count.[83]

---

[83] Gonzalez, 121 F.3d at 935 ("The agreements, a defendant's guilty knowledge and a defendant's participation in the conspiracy

Defendants nevertheless rely heavily on <u>United States v. Gardea Carrasco</u>[84] as support for their argument that the conspiracy conviction cannot stand. In <u>Gardea Carrasco</u>, we reversed one defendant's conspiracy conviction because no evidence was adduced at trial that he knew that the suitcases —— which he unloaded from a truck and transferred to a plane —— were full of controlled substances.[85] <u>Gardea Carrasco</u> is inapposite. Here, the record contains sufficient evidence that defendants knew that the bundles that they unloaded from the Cavalier contained controlled substances. Indeed, Delgado testified that the bundles smelled of marijuana. Moreover, the jury could have reasonably concluded that defendants knew of the controlled substances, as they purposefully hid the bundles in the canal outside their home. The obvious inference is that if the bundles had contained nothing but lawful substances, there would have been no reason to hide them in the canal.

Regarding the possession count, "[p]ossession may be actual or constructive and may be joint among several defendants."[86] As the knowledge element in a possession case will rarely be supported by

---

all may be inferred from the development and collocation of circumstances." (internal quotations omitted)).

[84] 830 F.2d 41 (5th Cir. 1987).

[85] <u>See id.</u> at 45.

[86] <u>United States v. Molinar-Apodaca</u>, 889 F.2d 1417, 1423 (5th Cir. 1989) (citing <u>United States v. Vergara</u>, 687 F.2d 57, 61 (5th Cir. 1982)).

direct evidence,[87] we have recognized that a possession count may be established by circumstantial evidence alone.[88]  Knowledge may also be inferred from "control over the location in which [the drugs] are found."[89]  Further, we have recognized that "the intent to distribute may be inferred from the value and quantity of the substance possessed."[90]

Having closely reviewed the entire record, we easily conclude that the government adduced evidence at trial sufficient to prove beyond a reasonable doubt that defendants had (1) the requisite knowledge of the marijuana and (2) the intent to distribute it, to support their convictions on the possession count.  As noted, both Delgado and Cardenas testified –– testimony credited by the jury –– that both defendants were present during the unloading of the marijuana.  Defendants exercised control over the canal where the marijuana was found –– indeed, they own to the center line of the canal.  In addition, the jury could have reasonably inferred that defendants had the requisite intent to distribute the marijuana because of the vast quantity found by the agents.  We reject defendants' challenge to the sufficiency of the evidence.

F.    Sentencing

---

[87] United States v. Garza, 990 F.2d 171, 174 (5th Cir. 1993).

[88] Molinar-Apodaca, 889 F.2d at 1423 (citing United States v. Wilson, 657 F.2d 755, 760 (5th Cir. 1981)).

[89] United States v. Moreno, 185 F.3d 465, 471 (5th Cir. 1999).

[90] Id.

34

Defendants each raise two challenges to the sentences that the district court imposed. They first raise an <u>Apprendi</u>/Sixth Amendment challenge to the district court's calculation of their base offense levels. Defendants argue that the district court should have calculated their base offense levels at 20, for an offense involving between 40 to 60 kilograms of marijuana, as opposed to 24, for an offense involving between 80 and 100 kilograms of marijuana. They base this challenge on the alleged conflict between the drug amounts specified in the indictment and those in the jury verdict form, arguing that the jury found them guilty of conspiring to possess and of possessing with the intent to distribute only 50 kilograms of marijuana as stated on the verdict form. Defendants also challenge the district court's increase of their base offense level by two levels for possession of a firearm in connection with the offense under U.S.S.G. § 2D1.1(b)(1).

Defendants concede that they lodged no Sixth Amendment objection to their sentences in the district court. Accordingly, our review is for plain error.[91] Again, plain error review entails a determination whether (1) an error existed; (2) the error was clear and plain; (3) the error affected the defendant's substantial

---

[91] <u>United States v. Mares</u>, 402 F.3d 511, 520 (5th Cir. 2005).

35

rights; and (4) the error affected the fairness, integrity, or public reputation of judicial proceedings.[92]

Here, plain error exists —— as we have held in all Apprendi/Booker challenges —— so we must determine whether the error affected defendants' substantial rights.[93]  To demonstrate that the district court's imposition of their sentences affected their substantial rights, defendants must show that the sentencing judge —— proceeding under an advisory rather than a mandatory guidelines regime —— would have arrived at a significantly different result.[94]

Defendants have made no such showing.  They point to nothing in the record to indicate that the district court would have sentenced them any differently had it sentenced them under an advisory guidelines regime.  Neither have we found any evidence that it would have done so.  Defendants have failed to carry their burden.[95]

---

[92] United States v. Miranda, 248 F.3d 434, 443 (5th Cir. 2001).

[93] See Mares, 402 F.3d at 521-22.

[94] See id.

[95] Defendants contend that because the district court sentenced them at the bottom of the Guidelines range, it would have sentenced them differently had it considered the Guidelines advisory.  We have rejected this argument before and do so again now. See United States v. Hernandez-Gonzalez, 405 F.3d 260 (5th Cir. 2005) (rejecting defendant's argument that sentencing judge would have sentenced him differently because, inter alia, judge sentenced him at bottom of Guidelines range); see also United States v. Garcia-Gil, 133 Fed. Appx. 102 (5th Cir. 2005) (unpublished) ("Therefore, merely showing a sentence at the bottom of the applicable guideline

Defendants nevertheless assert that our plain-error standard of review enunciated in Mares "flies in the face of United States v. Booker . . . and was effectively overruled three days after it was decided [by] Shepard v. United States." These arguments are unavailing. Mares is the law of this circuit until either the en banc court or the United States Supreme Court determines otherwise.[96] Neither did the holding in Shepard that under the Armed Career Criminal Act, a district court could not use a police report to enhance a sentence,[97] affect our holding in Mares that, when a defendant fails to lodge a Sixth Amendment objection in district court, we review for plain error. Defendants' arguments are unavailing.

## III. CONCLUSION

---

range, as Garcia-Gil does, is insufficient to show plain error in his sentence.").

We also note that defendants' challenge to their base offense level on drug quantity is specious. The indictment specifically alleged that defendants were guilty of conspiring to possess and of possessing with the intent to distribute a drug quantity of "more than 50 kilograms, that is, approximately 82.25 kilograms (180.95 pounds) of marihuana." Although the verdict form does not specify 82.25 kilograms of marijuana, it did state that the jury found defendants guilty of conspiring to possess and of possessing with the intent to distribute "at least 50 kilograms of marihuana, as charged in the indictment." As the indictment specified the amount of 82.25 kilograms of marijuana, it was not plain error for the district court to use that quantity in its determination of defendants' base offense levels.

[96] United States v. McPhail, 119 F.3d 326, 327 (5th Cir. 1997).

[97] — U.S. —, 125 S. Ct. 1254, 1260 (Mar. 7, 2005).

We reject defendants' challenges to their convictions and sentences. The judgment of the district court is, in all respects, AFFIRMED.